1   James A. Quadra (Bar No. 131084)
       quadra@meqlaw.com
2   Sylvia M. Sokol (Bar No. 200126)
       sokol@meqlaw.com
3   MOSCONE, EMBLIDGE & QUADRA, LLP
    220 Montgomery Street
4   Mills Tower, Suite 2100
    San Francisco, California 94104
5   Telephone: (415) 362-3599
    Facsimile: (415) 362-2006
6
    Brian P. Murray
7      bmurray@murrayfrank.com
    Lee Albert
8      lalbert@murrayfrank.com
    Gregory A. Frank
9      gfrank@murrayfrank.com
    MURRAY, FRANK & SAILER LLP
10  275 Madison Avenue, Suite 801
    New York, New York 10016
11  Telephone: (212) 682-1818
    Facsimile: (212) 682-1892
12
    *Counsel for Plaintiffs and the Proposed Direct Purchaser Class*
13
               UNITED STATES DISTRICT COURT
14
              NORTHERN DISTRICT OF CALIFORNIA
15
                 SAN FRANCISCO DIVISION
16
    TECHNOLOGY DEPOT OF LA MESA and   CASE NO.
17  HEATHER TREMBLAY, on behalf of
    themselves and others similarly situated;
18
                   Plaintiffs,           **CLASS ACTION COMPLAINT**
19
           v.                            **JURY TRIAL DEMAND**
20
    SONY OPTIARC, INC.; SONY OPTIARC
21  AMERICA INC.; SONY NEC OPTIARC
    INC.; SONY CORP.; TOSHIBA SAMSUNG
22  STORAGE TECHNOLOGY CORP.;
    TOSHIBA CORP.; SAMSUNG
23  ELECTRONICS CO.; HITACHI-LG DATA
    STORAGE INC.; HITACHI LTD.; and LG
24  ELECTRONICS INC.;
25             Defendants.
26
27
28



E-filing

FILED
2010 MAR -1 P 5:03
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

EMC

CV 10 0874

1

## I. INTRODUCTION

2  1. Plaintiffs Technology Depot of La Mesa and Heather Tremblay
3 (collectively "Plaintiffs") bring this action on behalf of themselves individually and a
4 plaintiff class (the "Class") consisting of all persons and entities who purchased optical
5 disc drives ("ODDs") and products containing them (referred to collectively as "ODD
6 Products") in the United States directly from one or more named defendants between
7 November 1, 2005 and the present (the "Class Period").

8  2. The ODDs that are the subject of this lawsuit include the following formats
9 for use in notebook and desktop computers: CD-ROMS ("CD"), CD-
10 recordable/rewritable ("CD-R/RW"), DVD-ROM ("DVD"), DVD-recordable/rewritable
11 (DVD±R/RW), Blu-Ray ("BD"), Blu-Ray-recordable/rewritable ("BD-R"/"BD-RE") and
12 HD-DVD. During the Class Period, ODDs served as one of the primary means for
13 recording and reading music, movies, and other digital data. During this time,
14 defendants' sales of ODDs generated billions of dollars in annual revenues and
15 exponentially expanded with the increased utilization of computers in households and
16 businesses throughout the United States. Nearly every computer that is used or sold in
17 the United States today is equipped with an ODD.

18  3. Upon information and belief in order to maintain price stability and
19 increase profitability in the ODD market, defendants conspired, combined, and
20 contracted to fix, raise, maintain, and stabilize the price at which ODD Products were
21 sold in the United States. Upon information and belief defendants fraudulently concealed
22 their anticompetitive conduct from plaintiffs and the Class in furtherance of the
23 conspiracy. As a result of defendants' unlawful conduct, plaintiffs and the other
24 members of the Class paid artificially inflated prices for ODD Products during the Class
25 Period. Such prices exceeded the amount they would have paid if the price for ODD
26 Products had been determined by a competitive market.

27

28

1

## II.    JURISDICTION AND VENUE

2    4.    Plaintiffs bring this action to obtain injunctive relief and to recover

3    damages, including treble damages, costs of suit, and reasonable attorneys' fees arising

4    from defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

5    5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,

6    1337(a) and 1367.

7    6.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22,

8    and 28 U.S.C. § 1391(b) and (c), in that at least one of the defendants resides in this

9    judicial district, is licensed to do business or is doing business in this judicial district.

10

## III.    PARTIES

11    **A.    Plaintiffs**

12    7.    Plaintiff Technology Depot of La Mesa is located at 8366 Parkway Drive,

13    La Mesa, California 91942.  Plaintiff Technology Depot of La Mesa purchased ODD

14    Products directly from one or more of the defendants during the Class Period.

15    8.    Plaintiff Ashley Tremblay resides at 314 79th Street, Apt. 9b, Brooklyn,

16    New York 11209.  Plaintiff Tremblay purchased an ODD product directly from one of

17    the defendants during the Class Period.

18    **B.    Defendants**

19    9.    Defendant Sony Optiarc America, Inc. ("SOA") is a wholly owned

20    subsidiary of defendant Sony Optiarc, Inc.  Defendant SOA is a Delaware corporation

21    with its business headquarters located at 1730 N. 1st Street, San Jose, California 95112.

22    During the Class Period, SOA manufactured, sold, and distributed ODD Products

23    throughout the United States.

24    10.    Defendant Sony Optiarc, Inc. ("SOI") is a Japanese company with its

25    headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-002,1 Japan.  Prior to

26    its formation in 2008, defendant SOI was a joint venture between defendants Sony Corp.

27    and NEC Corp. called Sony NEC Optiarc, Inc.  On September 11, 2008, Sony Corp.

28    purchased NEC Corp.'s interest in Sony NEC Optiarc, Inc.    The company was

1  subsequently renamed SOI. In 2008, SOI reported revenues of $1.52 billion. During the
2  Class Period, SOI manufactured, sold, and distributed ODD Products throughout the
3  United States.

4       11.    Defendant Sony NEC Optiarc, Inc. ("SNOI") was a Japanese company with
5  its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan.
6  Defendant Sony NEC Optiarc, Inc. was created on April 3, 2006 as a joint venture
7  between defendants Sony Corp. and NEC Corp. in which Sony Corp. had a 55% interest
8  and NEC Corp. had a 45% interest. Sony Corp. purchased NEC Corp.'s interest in Sony
9  NEC Optiarc, Inc. in 2008 and renamed it Sony Optiarc, Inc. During the Class Period,
10  SNOI manufactured, sold, and distributed ODD Products throughout the United States.
11  Sony Corp. and NEC Corp. exercised joint control over SNOI

12       12.    Defendant Sony Corp. ("Sony") is a Japanese company with its principal
13  place of business at 22-22 Nagaike-cho, Abeno-ku, Oasaka 545-8522, Japan. During the
14  Class Period, Sony manufactured, sold, and distributed ODD Products throughout the
15  United States.

16       13.    Defendant Toshiba Samsung Storage Technology Corp. ("TSST") is a joint
17  venture of defendants Toshiba Corp. and Samsung Electronics Co. that was established
18  on April 1, 2004. Toshiba owns 51% of the stock in TSST, while Samsung owns the
19  remaining 49%. TSST and Toshiba share corporate headquarters, which are located at 1-
20  1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class Period,
21  TSST manufactured, sold, and distributed ODD Products throughout the United States.
22  Toshiba Corp. and Samsung Electronics Co. jointly control TSST. TSST forecasted
23  revenue of Y250 billion in fiscal 2004, when it was established.

24       14.    Defendant Toshiba Corp. ("Toshiba") is a Japanese company with its
25  principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.
26  During the Class Period, Toshiba manufactured, sold, and distributed ODD Products
27  throughout the United States.

28       15.    Defendant Samsung Electronics Co., Ltd. ("Samsung") is a Korean

1  company with its principal place of business at Samsung Main Building, 250,
2  Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea. During the Class Period, Samsung
3  manufactured, sold, and distributed ODD Products throughout the United States.

4      16.  Hitachi-LG Data Storage ("HLDS") is a joint venture between defendants
5  Hitachi, Ltd. and LG Electronics, Inc., with its corporate headquarters located at 4F MSC
6  Center Bldg., 22-23, Kaigan 3-chome, Minato-Ku, Tokyo 108-0022, Japan. Hitachi, Ltd.
7  owns 51% of the stock in HLDS, while LG Electronics, Inc. owns the remaining 49%.
8  Hitachi, Ltd. and LG Electronics, Inc. jointly control and direct the operations of HLDS.
9  HLDS was established in November of 2000 and started operation in January of 2001.
10  Between 2001 and 2005 HLDS sold over 170 million optical disk drives, generating
11  approximately $5.5 billion in total revenues. During the Class Period, HLDS
12  manufactured, sold, and distributed ODD Products throughout the United States.

13      17.  Defendant Hitachi, Ltd. ("Hitachi") is a Japanese company with its
14  principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku,, Tokyo 100-8280,
15  Japan. During the Class Period, Hitachi manufactured, sold, and distributed ODD
16  Products throughout the United States.

17      18.  Defendant LG Electronics, Inc. ("LG Electronics") is a Korean entity
18  headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South
19  Korea 150-721. During the Class Period, LG Electronics manufactured, sold, and
20  distributed ODD Products throughout the United States.

21              **IV.  AGENTS AND CO-CONSPIRATORS**

22      19.  Various other persons, firms and corporations, not named herein as
23  defendants have participated as co-conspirators with the defendants and have performed
24  acts and made statements in furtherance of the conspiracy. Some of these firms are as yet
25  unidentified. Plaintiffs believe that these co-conspirators include Lite-On IT
26  Corporation, Koninklijke Philips Electronics N.V. and their joint venture that makes
27  ODD products, Philips & Lite-On Digital Solutions Corporation and its United States
28  subsidiary, Philips & Lite-On Digital Solutions USA, Inc.

**1**  20.    The acts alleged against the defendants in this Complaint were authorized,

**2**  ordered, or done by their officers, agents, employees, or representatives, while actively

**3**  engaged in the management and operation of defendants' businesses or affairs.

**4**  21.    Each defendant acted as the principal, agent, or joint venturer of, or for,

**5**  other defendants with respect to the acts, violations, and common course of conduct

**6**  alleged by plaintiffs.

**7**  22.    Whenever this Complaint refers to an act, deed or transaction of a

**8**  corporation or entity, the Complaint is alleging that the corporation or entity engaged in

**9**  the act, deed or transaction by or through its officers, directors, agents, employees or

**10**  representatives while they were actively engaged in the management, direction, control or

**11**  transaction of the corporation or entity's business or affairs.

**12**  ### V.    CLASS ACTION ALLEGATIONS

**13**  23.    Plaintiffs bring this action both on behalf of themselves, and as a class

**14**  action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the

**15**  following Class:

**16**  All persons and entities who purchased ODD Products in the United States
directly from one or more defendants between November 1, 2005 and the
**17**  present. Excluded from the Class are defendants, their parent companies,
subsidiaries and affiliates, all governmental entities, and any judges or
**18**  justices assigned to hear any aspect of this action.

**19**  24.    Plaintiffs do not know the exact number of Class members because such

**20**  information is in the exclusive control of defendants. Plaintiffs believe that, due to the

**21**  nature of the trade and commerce involved, there are most likely thousands of Class

**22**  members, geographically dispersed throughout the United States such that joinder of all

**23**  Class members is impracticable.

**24**  25.    Plaintiffs' claims are typical of the claims of the Class in that plaintiffs are

**25**  direct purchasers of ODD Products, all Class members were damaged by the same

**26**  wrongful conduct of defendants and their co-conspirators as alleged herein, and the relief

**27**  sought is common to the Class.

**28**  26.    Numerous questions of law or fact arise from defendants' anticompetitive

1   conduct that is common to the Class, including but not limited to:

2             a.    Whether defendants engaged in a contract, combination, and/or

3                  conspiracy to fix, raise, maintain, or stabilize prices of ODD Products

4                  sold in the United States;

5             b.    Whether defendants engaged in a contract, combination, and/or

6                  conspiracy to restrict output of ODD Products sold in the United

7                  States;

8             c.    Whether defendants' conduct caused the prices of ODD Products sold

9                  in the United States to be at artificially high and noncompetitive

10                 levels;

11            d.    Whether plaintiffs and the other members of the Class were injured by

12                 defendants' conduct, and, if so, the appropriate class-wide measure of

13                 damages for Class members; and

14            e.    Whether plaintiffs and the other members of the Class are entitled to,

15                 among other things, injunctive relief, and if so, the nature and extent

16                 of such injunctive relief.

17      27.    These and other questions of law and fact are common to the Class, and

18  predominate over any questions affecting only individual Class members.

19      28.    Plaintiffs' claims are typical of the claims of the Class because plaintiffs

20  directly purchased ODD Products from one or more of the defendants.

21      29.    Plaintiffs will fairly and adequately represent the interests of the Class in

22  that plaintiffs are direct purchasers of ODD Products and have no conflict with any other

23  members of the Class.   Furthermore, plaintiffs have retained competent counsel

24  experienced in antitrust, class action, and other complex litigation.

25      30.    Defendants have acted on grounds generally applicable to the Class,

26  thereby making final injunctive relief appropriate with respect to the Class as a whole.

27      31.    This class action is superior to the alternatives, if any, for the fair and

28  efficient adjudication of this controversy. Prosecution as a class action will eliminate the

1    possibility of repetitive litigation. There will be no material difficulty in the management

2    of this action as a class action.

3        32.    The prosecution of separate actions by individual Class members would

4    create the risk of inconsistent or varying adjudications, establishing incompatible

5    standards of conduct for defendants.

6        33.    Injunctive relief is appropriate as to the Class as a whole because

7    defendants have acted or refused to act on grounds generally applicable to the Class.

8        34.    Plaintiffs reserve the right to expand, modify or alter the Class definition in

9    response to information learned during discovery

10                       **VI.    TRADE AND COMMERCE**

11       35.    During the Class Period, each defendant, or one or more of its subsidiaries,

12   sold ODD Products in the United States in a continuous and uninterrupted flow of

13   interstate commerce and foreign commerce, including through and into this judicial

14   district.

15       36.    During the Class Period, the defendants collectively controlled a large share

16   of the market for ODD products globally and throughout the United States.

17       37.    The business activities of the defendants substantially affected interstate

18   trade and commerce in the United States and caused antitrust injury in the United States.

19                      **VII.    FACTUAL ALLEGATIONS**

20   **A.    Optical Disk Drive Technology & Industry Background**

21       38.    Optical discs contain microscopic pits where data are stored. These pits are

22   made from a crystalline metal alloy and are usually pressed into the disc in a spiral

23   arrangement, starting at the center of the disc. Once a disc containing information is

24   inserted into the ODD, the disc spins while a lens inside the device guides a

25   semiconductor laser beam over the disk and a photodiode detects the light reflected from

26   the disc's bumps and pits. The laser moves outward from the center of the disc, scanning

27   over the disc's surface. Then the photodiode reads the light's reflection as a binary code,

28   a series of ones and zeros that the computer translates into usable data. Changes in the

1    intensity of the beams as the lasers hit the pits are detected and translated into electrical
2    signals. The more pits that can be packed onto the disc, the more data the disc can store.
3    The pits are approximately 0.8 micrometers on CDs, 0.4 micrometers on DVDs, and 0.15
4    micrometers on BDs. Reading the different disc formats requires the ODD to have lasers
5    of different wavelengths. Blu-ray disc players use a shorter wavelength laser, which is
6    blue-violet, to read discs. Additional layers can be added to the disc as well, increasing
7    storage capacity. In addition to reading discs, ODDs can write and rewrite on the disc,
8    depending on the technology of the drive and accompanying disc.

9        39.    When a recordable disk (*e.g.*, CD-R, DVD-R or BD-R) is inserted into an
10   ODD that has the ability to record data, the ODD's laser is used to selectively heat parts
11   of the organic photosensitive dye layer. By exposing the disc to light with the laser, the
12   reflective properties of the disc's surface change, which causes the photodiode to
13   recognize these changes as bumps and pits and read the new information on the disc.

14       40.    ODDs include half height and slim models. Half height ODDs are thicker
15   and generally incorporated into desktop computer towers. Slim ODDs are thinner and
16   generally incorporated into laptop computers. As laptop computers have become more
17   popular with consumers, demand for slim optical disk drives has increased and is
18   expected to overtake half height demand over the next five years.

19       41.    Table 1 provides an overview of the names, sizes and capabilities of the
20   main, available ODD standards. There are also differences in ODDs with regard to data
21   access speeds and writing speeds. ODDs built more recently are "backwards compatible"
22   such that ODDs with the latest technology can still read first generation CD-ROMs. DVD
23   rewriteable drives have been the mainstream ODD for computers since 2006.

| Table 1: Overview of Optical Disc Drive Standards | | |
|---|---|---|
| **Drive Standard** | **Capacity [a]** | **Capability** |
| CD-ROM | 700 MB | Read Only |
| CD-R | 700 MB | Read, Write |
| CD-RW | 700 MB | Read, Write, Rewritable |
| DVD-ROM | 4.7 GB | Read Only |
| DVD-RAM | 4.7 GB | Read, Write |
| DVD-R [b] | 4.7 GB | Read, Write |
| DVD-RW [b] | 4.7 GB | Read, Write, Rewritable |
| BD-ROM | 25 GB Single Layer; 50 GB Dual Layer | Read Only |
| BD-R | 25 GB Single Layer; 50 GB Dual Layer | Read, Write |
| BD-RE | 25 GB Single Layer; 50 GB Dual Layer | Read, Write, Rewritable |

[a] These are standard capacities. Depending on the number of layers, or if the disc can be read double-sided, the capacity will be larger.

[b] There are other DVD standards such as DVD+R/RW, which include other features or improvements- see http://www.videohelp.com/dvd.

Source: See http://www.videohelp.com/dvd and http://www.tech-faq.com/blu-ray.shtml.

42.     The first ODD was invented with the creation of the audio compact disc (audio "CD"), which was jointly invented by Sony and Philips Electronics ("Philips"). In 1972, Philips announced a technique for storing audio recordings on an optical disc with a small diameter. At the same time, Sony was exploring optically recording audio on a larger disc but was focusing on developing an error correction technique. In 1978, Sony and Philips agreed on a single format for the disc and the error correction method that would be used. The compact disc system was introduced to the public in Japan and Europe in 1982. Since the 1980s, several companies have created spin-offs of the CD project by covering specific CD-based applications and extending the previously established standards set by Sony and Philips.

43.     Once the standard of how to create a CD and an optical device that reads the information on the CD were established, CD-ROM drives began to penetrate the

**1**    computer market. Optical drives have been in common use in computers since the 1990s,
**2**    when CD-ROM drives became affordable for the average consumer. Thereafter,
**3**    manufacturers developed optical disk drives for computers that could read and write
**4**    DVDs and Blu-Ray discs, which can hold more data than a CD-ROM.

**5**        44.    Today, ODDs are a standard component on almost every computer used in
**6**    the United States. Due to the increasing popularity of personal computers, hundreds of
**7**    millions of ODDs and ODD Products are shipped by defendants each year, generating
**8**    billions of dollars in annual revenues. As seen in Figures 1 and 2 below, worldwide
**9**    ODD shipments increased to over 300 million in 2007 and generated over $45 billion in
**10**    revenues between 2004 and 2008.



**Worldwide Optical Drive Shipment Value, 2004-2008**

Note: Value based on imputed prices to OEM customers.
Source: "Worldwide Blu-Ray, DVD, CD and Other Optical Storage Drive 2009-2013 Forecast and Analysis", IDC, May 2009, Table 8.

1
2
3
4
5
6
7
8
9
10
11
12



**Worldwide Optical Disk Drive Shipments**

Source: Digitimes Research: ICT Reports - 1Q 2005 and Q4 2007

13  **B.     Characteristics of the ODD Products Industry Made it Ripe for Collusion**

14          45.     The ODD Products industry has several characteristics that facilitate a

15  conspiracy, including market concentration, ease of information sharing, multiple

16  interrelated business relationships, significant barriers to entry, and homogeneity of

17  products.

18          **i.     Market Concentration**

19          46.     During the Class Period, the ODD industry has been dominated by

20  relatively few companies, including defendants. During the Class Period, defendant

21  HLDS, which is a joint venture between defendants Hitachi and LG Electronics,

22  established itself as the industry's top manufacturer with overall annual market share of

23  between 25% and 30% of shipments.  TSST, a joint venture formed in 2004 by

24  defendants Toshiba and Samsung, is the second largest optical disk drive manufacturer in

25  the world with an annual market share in excess of 20%. In 2008, defendants HLDS,

26  TSST, and SOI were among the largest producers of ODDs in the world, with a

27  combined market share of 67%. Defendants' dominance and control over the ODD

28  market facilitated their ability to implement their conspiracy to fix the price of ODD

1    Products.

2          ii.    **Joint Ventures and Coordinated Business Activities**

3          47.    Defendants were also involved and relied upon joint ventures and long

4    standing business relationships in the ODD market that gave them continuous

5    opportunities to discuss pricing, capacity utilization, and other important prospective

6    market information. As noted above, the first of these joint ventures was HLDS, which

7    was established as a joint venture between defendants Hitachi and LG Electronics in

8    November of 2000 and started operation in January of 2001. In April of 2004,

9    defendants Toshiba and Samsung consolidated their optical disc drive divisions to form

10   TSST. Approximately two years later, Sony and NEC Corporation entered into an

11   optical disc drive joint venture to form SNOI.

12         48.    The formation of these joint ventures was the product of the exchange of

13   information, and evidence of an ongoing antitrust conspiracy between defendants.

14   Furthermore, the mutually beneficial nature of the business relations between certain

15   defendants provided the opportunity to conspire and created a financial incentive to do

16   so. As one Sony spokesman explained when announcing the formation of SNOI, the

17   joint venture came into existence because: *"There was a feeling that those two*

18   *complementary strengths [Sony and NEC] would make more sense in a joint venture*

19   *than competing against each other."*

20         iii.   **Barriers to Entry Into the ODD Industry**

21         49.    There are significant manufacturing and technological barriers to entry into

22   the ODD industry. In order to compete in the ODD industry, companies have to spend

23   hundreds of millions of dollars in research and development, licensing, and

24   manufacturing of products. Moreover, the ownership and control exerted by defendants

25   over ODD Product technology and market share has allowed defendants to dictate who

26   enters the market and at what cost. These barriers to entry have made it extremely

27   difficult for smaller manufacturers of ODD Products to compete with defendants and

28   overcome the effects of economies of scale. Accordingly, the financial structure of the

**1** ODD industry allowed defendants to implement their antitrust conspiracy by eliminating
**2** competition and artificially stabilizing the prices of ODD Products without losing market
**3** share.

**4**       iv.    **Trade and Business Organizations**

**5**      50.    During the Class Period, defendants belonged to trade and business
**6** organizations that focused on ODD Products and related industries, such as the DVD
**7** Forum, the Optical Storage Technology Association ("OSTA"), the International
**8** Symposium of Optical Memory ("ISOM") and the Blue-ray Disc Association ("BDA").
**9** The DVD Forum, which includes defendants Hitachi, LG Electronics, Samsung, Sony,
**10** and Toshiba as members of its steering committee, is an organization responsible for the
**11** licensing and distribution of DVD products whose "purpose is to exchange and
**12** disseminate ideas and information about the DVD Format and its technical capabilities,
**13** improvements and innovations." BDA's members include Hitachi, LG, NEC, Philips,
**14** Samsung, Sony, and Toshiba. OSTA's members include LG Electronics and Sony. As
**15** explained on its website, OSTA was:

**16**     incorporated as an international trade association in 1992 to promote the
**17**     use of writable optical technologies and products for storage of computer
    data. The organization's membership includes optical product
**18**     manufacturers and resellers from three continents, representing more than
    85 percent of worldwide writable optical product shipments. They work to
**19**     shape the future of the industry through regular meetings of CD/DVD, file
    interchange, market development, magneto-optical and planning
**20**     committees.

**21**      51.    During the Class Period, these organizations held multiple meetings and
**22** conferences attended by defendants and their employees, which provided defendants with
**23** the opportunity to meet, discuss, and agree upon their pricing of ODD Products. For
**24** example, on March 16-18, 2009, the members of OSTA met at the Pacific Business
**25** Centers at 19925 Stevens Blvd., Cupertina, California 95104. All defendants were
**26** present at that meeting, where they were able to communicate and confer. Similarly, the
**27** Steering Committee of the DVD Forum last met on September 10, 2009 at the Universal
**28** Hilton Hotel in Los Angeles, California. At the meeting, for which defendant Toshiba

1 was the chair.

2        **v.**   **Standardization of ODD Products**

3     52.     Since its inception in the 1970s, the ODD industry has been typified by

4 standardization of discs (*e.g.*, CD-ROMs, DVD-ROMs) and ODD Products driven by

5 industry participants and a variety of industry-related organizations such as ECMA

6 International, the International Standardization Organization ("ISO"), and International

7 Electrotechnical Commission ("IEC"). These organizations and their members are

8 dedicated to "standardizing the use of information communication technology and

9 consumer electronics."

10     53.     The ODD industry is also subject to patents and intellectual property rights

11 which require adoption of standardized product specifications. As stated by Philips

12 Consumer Electronics B.V., which is responsible for the development of CD technology

13 and continues to hold patents and licensing rights arising therefrom:

14       Standardization offers many other advantages to industry as a whole. For
15       example: [1] Improvements to performance, compatibility, reliability, safety
      and interoperability; [2] Economies of scale and lower costs – for example,
16       by allowing manufacturers to address multiple regions with a single product
      or manufacturing line; and [3] *Cooperation between industry leaders,*
17       *reducing the risk for 'first-mover' companies which pioneer new products*
18       *or technologies*.(Emphases added)

19     54.     The standardization of the ODD Products industry provided defendants

20 with the mechanism to implement, enforce, and oversee their anticompetitive conspiracy

21 to fix the price of ODD Products. Furthermore, as a result of this standardization, ODD

22 Products are commodity products, and buyers make decisions to purchase such products

23 based largely, if not exclusively, on price.

24 **C.**   **Collusion on Prices for ODD Products**

25     55.     Upon information and belief plaintiffs herein allege that faced with

26 shrinking profits from ODD Products, defendants conspired to fix, raise, maintain, and

27 stabilize the price of ODD Products in the United States at artificially inflated and

28 anticompetitive levels in order to preserve and increase their revenues.

56. Defendants have been the subject of government investigations for their cartel activity in recent years. For example, Samsung admitted guilt and paid a $300 million fine following an investigation by the United States Department of Justice ("DOJ") into price-fixing of dynamic random access memory ("DRAM") computer chips. The DOJ is currently investigating Samsung, LG Electronics, Toshiba, and Hitachi, among others, concerning collusion among manufacturers of thin film transistor liquid crystal display ("TFT-LCDs"). The ongoing TFT-LCD criminal investigation has resulted in hundreds of millions of dollars in criminal penalties and admissions of guilt by LG Electronics ($400 million) and Hitachi ($31 million).

57. These same companies have been under investigation in the European Union ("EU"). The entities mentioned in the preceding paragraph are all under investigation for colluding to fix prices on TFT-LCDs sold in Europe. And in November of 2007, the EU fined, *inter alia*, Sony and various related entities and the Hitachi Maxell Limited joint venture $110 million for fixing the prices of professional videotapes sold in Europe between 1999 and 2002. Similarly, Hitachi and Toshiba were fined by the European Commission for their roles in a conspiracy to control prices and allocate market shares in the market for gas-insulated switchgear between 1988 and 2004.

58. Upon information and belief, defendants are currently under investigation by the DOJ for anticompetitive conduct in connection with the ODD industry. Plaintiffs are further informed and believe, and thereon allege, that the United States' criminal investigation of the ODD conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of California.

59. On Monday, October 26, 2009, defendants SOA, TSST and HLDS confirmed that they received subpoenas from the DOJ in connection with a criminal antitrust investigation into possible price-fixing, bid-rigging, and allocation of markets regarding ODDs. News reports indicated that EU and Singaporean antitrust authorities were conducting similar investigations.

60. On Tuesday, October 28, 2009, it was announced that Sony and Philips

16
CLASS ACTION COMPLAINT

1 were fined by the foreign antitrust enforcement agency, the Taiwan Fair Trade
2 Commission, for their anticompetitive business practices in connection with the licensing
3 of the technology for CD-Rs, discs that are used in optical disk drives.

4     61.    It is significant that defendants' anticompetitive behavior has been the
5 subject of a criminal grand jury investigation by the DOJ. In order for the DOJ to
6 institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a
7 crime has been committed and prepare a detailed memorandum to that effect. *See*
8 Antitrust Grand Jury Practice Manual, Vol. 1, Ch. I.B.1 ("[i]f a Division attorney believes
9 that a criminal violation of the antitrust laws has occurred, he should prepare a
10 memorandum requesting authority to conduct a grand jury investigation.") Furthermore,
11 following a review of the memorandum, the request for a grand jury must be approved by
12 the Assistant Attorney General for the Antitrust Division, based on the standard that a
13 criminal violation may have occurred. *See id.* In addition, the fact that the DOJ Antitrust
14 Division investigation is criminal, as opposed to civil, is significant as well. The
15 Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal
16 Investigation" state: "[i]n general, current Division policy is to proceed by criminal
17 investigation and prosecution in cases involving horizontal, per se unlawful agreements
18 such as price fixing, bid rigging and horizontal customer and territorial allocations." *See*
19 Antitrust Division Manual, Chapter III.C.5. Accordingly, the existence of a criminal
20 investigation into the ODD industry supports the existence of the conspiracy alleged
21 herein.

22     62.    It is also significant that pricing trends for ODD technology have not
23 followed the traditional price declination patterns of older technologies. Strangely, the
24 disappearance of HD-DVD from the market has had no significant effect on the prices for
25 Blu-Ray optical disk drives, which have remained substantially the same over time.

26 **D.    Effects of Defendants' Antitrust Violations**

27     63.    The above combination and conspiracy has had the following effects,
28 among others:

1
2
3

    a.    Price competition in the sale of ODD Products by defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

4
5
6

    b.    Prices for ODD Products sold by defendants have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

7
8
9

    c.    Direct purchasers of ODD Products from defendants have been deprived of the benefit of free and open competition in the purchase of ODD Products.

10
11
12
13

    64.    As a direct and proximate result of the unlawful conduct of defendants, plaintiffs and other members of the Class have been injured in their businesses and property in that they paid more for ODD Products than they otherwise would have paid in the absence of the unlawful conduct of defendants.

14

**E.   Fraudulent Concealment**

15
16
17
18
19
20
21
22

    65.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief despite diligence in trying to discover the pertinent facts. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until October of 2009 when the antitrust investigation by the DOJ became public. Defendants engaged in a secret conspiracy that did not give rise to facts that would put plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for ODDs.

23
24
25
26

    66.    As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that plaintiff and the Class members have as a result of the anticompetitive conduct alleged in this Complaint.

27

### VIII.  CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

28

    67.    Plaintiffs incorporate by reference all the above allegations as if fully set

1     forth herein.

2       68.    Beginning at least as early as November 1, 2005, the exact date being
3 unknown to plaintiffs and exclusively within the knowledge of defendants, defendants
4 and their co-conspirators entered into a continuing contract, combination or conspiracy to
5 unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act
6 (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

7       69.    In particular, defendants have combined and conspired to raise, fix,
8 maintain or stabilize the prices of ODD Products sold in the United States.

9       70.    As a result of defendants' unlawful conduct, prices for ODD Products were
10 raised, fixed, maintained, and stabilized in the United States.

11       71.    The contract, combination or conspiracy among defendants consisted of a
12 continuing agreement, understanding, and concerted action among defendants and their
13 co-conspirators.

14       72.    For purposes of formulating and effectuating their contract, combination, or
15 conspiracy, defendants and their co-conspirators did those things they contracted,
16 combined, or conspired to do, including:

17            a.    Participating in meetings and conversations to discuss the prices and
18                  supply of ODD Products;

19            b.    Communicating in writing and orally to fix prices of ODD Products;

20            c.    Agreeing to manipulate prices and supply of ODD Products sold in
21                  the United States in a manner that deprived direct purchasers of free
22                  and open competition;

23            d.    Issuing price announcements and price quotations in accordance with
24                  the agreements reached;

25            e.    Selling ODD Products to customers in the United States at non-
26                  competitive prices; and

27            f.    Providing false statements to the public to explain increased prices for
28                  ODD Products.

**1**      73.    As a result of defendants' unlawful conduct, plaintiffs and the other
**2**   members of the Class have been injured in their businesses and property in that they have
**3**   paid more for ODD Products than they otherwise would have paid in the absence of
**4**   defendants' unlawful conduct.

**5**                          **IX.    DAMAGES**

**6**      74.    During the Class Period, plaintiffs and the other members of the Class
**7**   purchased ODDs directly from defendants, or their subsidiaries, agents, and/or affiliates,
**8**   and, by reason of the antitrust violations herein alleged, paid more for such products than
**9**   they would have paid in the absence of such antitrust violations. As a result, plaintiffs
**10**   and the other members of the Class have sustained damages to their businesses and
**11**   property in an amount to be determined at trial.

**12**                          **X.    PRAYER FOR RELIEF**

**13**      WHEREFORE, plaintiffs pray that the Court enter judgment on its behalf and on
**14**   behalf of the Class herein, adjudging and decreeing that:

**15**      A.    This action may proceed as a class action, with plaintiffs as the designated
**16**   Class Representatives and their counsel as Class Counsel;

**17**      B.    Defendants have engaged in a contract, combination, and conspiracy in
**18**   violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiffs and the
**19**   Class have been injured in their businesses and property as a result of defendants'
**20**   violations;

**21**      C.    Plaintiffs and the members of the Class recover damages sustained by them,
**22**   as provided by the federal antitrust laws, and that a joint and several judgment in favor of
**23**   plaintiffs and the Class be entered against the defendants in an amount to be trebled in
**24**   accordance with such laws;

**25**      D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees,
**26**   and the respective officers, directors, partners, agents, and employees thereof and all
**27**   other persons acting or claiming to act on their behalf be permanently enjoined and
**28**   restrained from continuing and maintaining the combination, conspiracy, or agreement

1  alleged herein;

2       E.  Plaintiffs and the members of the Class be awarded pre-judgment and post-

3  judgment interest, and that such interest be awarded at the highest legal rate from and

4  after the date of service of the initial complaint in this action;

5       F.  Plaintiffs and the members of the Class recover their costs of this suit,

6  including reasonable attorneys' fees as provided by law; and

7       G.  Plaintiffs and the members of the Class receive such other or further relief as

8  may be just and proper.

9                   **XI.  JURY TRIAL DEMANDED**

10       Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury

11  of all of the claims asserted in this Complaint so triable.

12

13  DATED:  March 1, 2010      By: _____

14                            James A. Quadra (Bar No. 131084)
                          quadra@meqlaw.com

15                            Sylvia M. Sokol (Bar No. 200126)
                          sokol@meqlaw.com

16                           MOSCONE, EMBLIDGE & QUADRA, LLP
                         220 Montgomery Street

17                           Mills Tower, Suite 2100
                         San Francisco, California 94104

18                           Telephone: (415) 362-3599
                         Facsimile: (415) 362-2006

19                           Brian P. Murray
                          bmurray@murrayfrank.com

20                           Lee Albert
                          lalbert@murrayfrank.com

21                           Gregory A. Frank
                          gfrank@murrayfrank.com

22                           MURRAY, FRANK & SAILER LLP
                         275 Madison Avenue, Suite 801

23                           New York, New York 10016
                         Telephone: (212) 682-1818

24                           Facsimile: (212) 682-1892

25                           *Counsel for Plaintiffs and the Proposed*
                         *Direct Purchaser Class*

26

27

28